1
2
3
4
5
6
7 **UNITED STATES DISTRICT COURT**
8 **DISTRICT OF NEVADA**
9
10 TERESA FELDSHER,
11    Plaintiff,                              Case No. 2:13-cv-00533-LDG-GWF
12 v.                                         **ORDER**
13 LIBERTY LIFE ASSURANCE
   COMPANY OF BOSTON as Claims
14 Administrator for Farmers Group, Inc.'s
   Group Disability Income Policy,
15
      Defendant.
16
17
18       The plaintiff, Teresa Feldsher, appeals the decision of the defendant, Liberty Life

19 Assurance Company of Boston ("Liberty"), to conclude her long-term disability benefits

20 after 24 months of payments.  Liberty refused to extend the benefits following its

21 determination that Feldsher's impairments were due to mental illness.  Liberty additionally

22 determined that the impairments did not prevent Feldsher from working.  Feldsher argues

23 that Liberty made procedural mistakes in reaching its decision and substantively

24 misinterpreted her medical records, and therefore was wrong to discontinue her benefits.

25 Each party has moved for judgment on the administrative record, submitting opening briefs

26

1  (#31, #32), opposing briefs (#34, #35) and reply briefs (#37, #38).  The Court reviews

2  Liberty's decision for abuse of discretion.

3      Background

4      In October 2009, Feldsher was working as a claims representative for Farmers

5  Group, Inc., when she sought and received short-term disability benefits through Farmers'

6  insurance provider, Liberty.  In May 2010, following the expiration of Feldsher's short-term

7  benefits, Liberty granted Feldsher 24 months of long-term disability (LTD).

8      Feldsher's insurance plan defines a person as disabled, and therefore entitled to 24

9  months of benefits, if "the Covered Person is unable to perform all of the material and

10  substantial duties of his occupation on an Active Employment basis because of an Injury or

11  Sickness."  After the 24-month period, a person is defined as disabled if "the Covered

12  Person is unable to perform, with reasonable continuity all of the material and substantial

13  duties of his own or any other occupation for which he is or becomes reasonably fitted by

14  training, education, experience, age and physical and mental capacity" (AR 000005).

15  Additionally, if Liberty determined that mental illness caused the disability, the person,

16  though disabled, would not be entitled to receive any benefits beyond the initial 24-month

17  period (AR 000015).

18      Informing Feldsher of its initial decision, Liberty wrote:

19      "We have determined you are disabled from seizures/tremors and are eligible
        to receive LTD benefits.

20
        Our review also indicated that you have been diagnosed with major
21      depressive disorder, bipolar and generalized anxiety disorder.  We have
        requested additional information to assess your restrictions and limitations
22      from this diagnosis.  Please be advised that if your major depressive disorder,
        bipolar and generalized anxiety disorder is determined to be disabling, you
23      will also be subject to the Mental/Illness provision in the policy . . . ."
        (AR 000551).

24
25      Over the course of approximately 18 months, while receiving monthly benefit

26  payments from Liberty, Feldsher continued to meet with a variety of doctors to better

2

1   understand her condition, including visits to her primary care physician, Kimberly Adams,

2   M.D., her neurologist, Venkat Veerappan, M.D., and her therapist, Nancy Clark, M.S.,

3   M.F.T.; a "neuropsychological consultation" with Minh-Thu T. Le, Ph.D.; and an

4   independent neuropsychological examination with Ted Young, Ph.D.  During this same

5   time period, Liberty consultants Robert Millstein, M.D., James Taylor, Ph.D., and Elisa

6   Fuller, M.D., reviewed Feldsher's file, including medical records from the above visits[1].

7         Among other early findings were the following conclusions: in October 2010, Dr. Le

8   found that while "idiopathic seizure disorder" could be a cause, "multiple psychosocial

9   stressors reported cannot be ruled out" (AR 000477); in January 2011, Dr. Fuller found that

10  "the current records suggest that impairments are primarily in relation to the claimant's

11  seizure disorder" and that "there is currently no medical basis upon which to support the

12  presence of impairment secondary to a psychiatric illness (AR 000446, 000440); and in

13  March 2011, Dr. Young found that there could be "a substantial or even dominant organic

14  component to her symptoms," although they were likely exacerbated by mental illness (AR

15  000404).

16        In November 2011, Liberty wrote to Feldsher, informing her that "the condition that

17  disables you has a 24 month limitation" (AR 000341).  The letter reprinted the mental

18  illness provisions contained in Feldsher's insurance policy, but otherwise gave no

19  information regarding its decision to conclude its coverage after 24 months.

20        Internally, however, Liberty continued to review Feldsher's file, seeking more

21  conclusive analysis.  In January, 2012, Choon Rim, M.D., conducted an "independent peer

22  review" of Feldsher's medical records, as well as a phone consultation with Dr. Veerappan

23  (AR 000244).  Additionally, another independent neuropsychological examination was

24  conducted by Dr. Young, one year after the first examination (AR 000223).  This

25  _____

26        [1] A succinct overview of Feldsher's medical history is at AR 000104-109.

1   examination was again reviewed by Liberty's consulting neuropsychologist, Dr. Taylor (AR

2   000218).  Also in this time period, Russell Graham, the case manager for Feldsher's file,

3   recommended that a transferable skills analysis ("TSA") be conducted, although for

4   reasons never addressed in the record, this recommendation was not acted upon (AR

5   000041).

6        On May 1, 2012, Feldsher received a letter, confirming that her benefits had

7   concluded as of April 27, 2012, after 24 months of receiving long-term disability benefits.

8   Rather than relying on the opinions of Dr. Le, Dr. Fuller, or Dr. Young, all from March 2011

9   or earlier, the letter specifically relied on the work of Dr. Veerappan, Dr. Rim, Dr. Young,

10  and Dr. Taylor, all from January 2012 or later (AR 000211-000218).  Quoting Dr.

11  Veerappan from January 2012, the letter noted that although Feldsher experienced both

12  "genuine seizures" and "non-epileptic pseudoseizures," these "were under fairly good

13  control," and "the main reason [she] would not be able to function on the job would by [sic]

14  [her] cognitive difficulties."  Quoting Dr. Rim from January 2012, the letter noted that "her

15  cognitive difficulties are the main impairment," that working would likely be possible as long

16  as "climbing ladders or working at unprotected heights and working around open machinery

17  and driving a motor vehicle" were restricted, and that "[t]he claimant also has non-epileptic

18  psychogenic seizures which may or may not cause impairments, but purely from the

19  neurological perspective, this should not cause any impairment."  Quoting Dr. Young from

20  March 2012, the letter noted that there were no "findings . . . of stable physical brain injury,"

21  that "he was able to identify not [sic] stable cognitive deficits that would prevent

22  employment," and that "no test findings obtained by [Dr. Young] attest to disability."  Finally,

23  quoting Dr. Taylor from a report dated the same day as the letter, the letter noted, "I would

24  concur that findings from [Dr. Young's] standardized assessment did not support limitations

25  in work capacity," and "it is my opinion that many limitations on work capacity are thought to

26  be due to psychological factors."  Thereafter, the letter concluded:

4

1    Based on findings from your medical records, evaluations, and reports, the
     supported restrictions and limitations are of a mental-nervous origin.  In
2    addition, a consulting physician reviewed your claim and opined that from a
     purely neurological perspective, this condition should not cause any
3    impairment.  As you have been approved for 24 months of benefits . . . no
     further benefits are payable.
4    AR 000216

5         In October 2012, Feldsher sent an appeal letter to Liberty, which included additional

6    records from Dr. Veerappan, as well as letters from two previous co-workers indicating their

7    belief that Feldsher was too disabled to work (AR 000146-163).  In response, Liberty

8    submitted Feldsher's file to Sherry Withiam-Leitch, M.D., for an additional review of all

9    medical records, including a phone conversation with Dr. Veerappan (AR 000104).

10   According to Dr. Withiam-Leitch, Dr. Veerappan suggested that "[Feldsher] is able to work

11   with precautions."  Dr. Withiam-Letich further reported that Feldsher had an "ongoing

12   seizure disorder," and that she therefore should not drive, swim or bathe alone, and should

13   avoid heights and heavy machinery.  Dr. Withiam-Leitch further noted that Feldsher's

14   previous employment at Farmers Group required her to climb, drive, and be exposed to

15   moving mechanical parts.  However, Dr. Withiam-Leitch ultimately concluded that Feldsher

16   "has the capacity for full-time work" (AR 000110).

17        This report was subsequently submitted to Bernadette Cook for a TSA.  Cook relied

18   on Dr. Withiam-Leitch's comprehensive review of Feldsher's records, along with documents

19   submitted by Feldsher to Liberty, such as an "Activities Questionnaire," to complete the

20   TSA.  The documents consulted included a description of her employment duties, as

21   described by her employer (AR 000100).  The "Essential Job Functions" category included

22   the following requirements:

23   "Investigates, confirms coverage, determines liability, establishes damages,
     reports status and negotiates the settlement of assigned cases (has
24   authority to make payment of assigned claims within prescribed limits).
     Adjusts all types of claims.  Inspects damaged property and vehicles, and
25   determines claims-related damage.  Estimates the cost of repair or
     replacement of damaged or stolen property and vehicles.  Determines and
26   reports on subrogation potential.  Initiates the sale of salvage vehicles,

                                            5

1
2
3
4
5
6
7

personal property, and miscellaneous salvage items.  Reports theft, fraud, and arson losses as required to state and industry agencies.  Performs most duties on an individual basis, and work has a direct bearing on Management results.  Represents the Company from a public relations standpoint and must conduct oneself as a member of Management at all times.  Personal contacts are a major part of activity and include policyholders, claimants, agents, witnesses, repair facilities, contractors, police and fire departments, state and county fraud and arson personnel, special investigators, attorneys, expert witnesses, members of the medical profession and all other persons incident to the investigation and processing of claims.  Promotes safety at all times and complies with safety/ergonomic standards as outlined in relevant company published manuals.  Performs other duties as assigned.
(AR 000707-708)

8      Cook made no reference to separate sections of the document, entitled "Physical

9   Demands" and "Special Skills Requirements," which described the job as requiring

10   "climbing [and] reaching," warning that employees may be exposed to  "uncontrolled outside

11   environmental conditions [and] moving mechanical parts," and requiring employees to

12   maintain a "valid driver's license."  Notwithstanding the limitations recommended by Dr.

13   Witham-Leitch, Cook concluded that "Ms. Feldsher would be able to perform the essential

14   functions of her own occupation as well as the essential functions of the [five] alternative

15   occupations identified.  With a reasonable degree of vocational certainty, Ms. Feldsher

16   would be able to earn the wages noted" (AR 00102).

17      In January 2013, Liberty responded to Feldsher's appeal by upholding its decision to

18   deny future benefits.  In a letter, Liberty wrote:

19
20

The claim file does not support Ms. Feldsher's claim that cognitive impairment is a result of her genuine seizure disorder and/or a physical brain injury, rather the data suggest her cognitive complaints arise from psychological factors.

21
22
23
24

The policy limits Mental Illness, Substance Abuse and Non-Verifiable Symptoms claims to a period of 24 months.  Ms. Feldsher exhausted that period on April 27, 2012.  The supported physical restrictions and limitations arising from Ms. Feldsher's diagnosis of genuine seizure disorder do not prevent her from performing Any Occupation.
(AR 000094).

25
26

6

Standard of Review

Feldsher thereafter brought the instant complaint, appealing through the Employee Retirement Income Security Act (ERISA).  29 U.S.C. § 1001.  Both parties agree that the Court's review will be conducted according to the "abuse of discretion" standard. According to the Ninth Circuit, "plan administrators abuse their discretion when they 'render decisions without any explanation, or construe provisions of the plan in a way that conflicts with the plain language of the plan.'  Similarly . . . an abuse of discretion occurs when a plan administrator fails to develop facts necessary to make its determination."  *Schikore* v. *BankAmerica Supplemental Retirement Plan*, 269 F.3d 956 (9th Cir. 2001) (citing *Eley v. Boeing Co.*, 945 F.2d 276, 279 (9th Cir. 1991); *Taft v. Equitable Life Assur. Soc.*, 9 F.3d 1469, 1473 (9th Cir. 1993)).

The Ninth Circuit has further held "that an insurer that acts as both the plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest . . . As the Supreme Court indicated in *Firestone*, such an inherent conflict of interest, even if merely formal and unaccompanied by indicia of bad faith or self-dealing, ought to have some effect on judicial review."  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 966 (9th Cir. 2006).  "A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage.  An egregious conflict may weigh more heavily . . . than a minor, technical conflict might."  *Id.* at 968.  Therefore, although this Court will apply an abuse of discretion standard of review, it will do so with an additional degree of skepticism, due to Liberty's conflict of interest in simultaneously determining eligibility for benefits and providing funding for those benefits.

Analysis

Feldsher argues both that Liberty violated its procedural policies and that Liberty reached a substantively wrong conclusion in denying her further benefits.  Procedurally,

1    she argues (1) that Liberty's first letter failed to provide Feldsher with important details

2    regarding the basis of its decision, and (2) that Liberty's initial failure to perform a TSA, and

3    subsequent reliance on a TSA during the appellate period, prevented Feldsher from

4    disputing its conclusions.  Substantively, she argues (3) that Liberty misinterpreted

5    Feldsher's medical records in reaching its decision, 'cherry picking' which records to focus

6    on, and (4) that even if Liberty's interpretation of her medical records were correct, it still

7    failed to determine that Feldsher's impairments were due to mental illness.  Feldsher

8    argues that these concerns, taken together, and reviewed in a skeptical light due to the

9    conflict of interest inherent in Liberty's business structure, demonstrate an abuse of

10   discretion.

11         The Court disagrees.  The Court recognizes that Liberty has taken significant steps

12   to limit any potential conflict of interest concerns (#31, 3:9-4:10).  However, even under a

13   more skeptical abuse of discretion review, the Court finds that Liberty did not abuse its

14   discretion in concluding that Feldsher's benefits would not be extended.

15         <u>Procedural Arguments</u>

16         Neither of the procedural missteps Feldsher accuses Liberty of making, even if true,

17   amount to an abuse of discretion.  First, Feldsher argues that the November 2011 letter

18   reached a determination regarding Feldsher's future benefits without referring to any

19   medical documentation.  Yet the November 2011 letter was not final.  Its purpose was to

20   alert Feldsher to Liberty's tentative position at that time.  The ultimate determination,

21   including a detailed basis for the decision, occurred in May 2012.  The lack of detail within

22   the November 2011 letter is therefore irrelevant to determining whether or not Liberty

23   abused its discretion in denying Feldsher's claim.

24         Second, Feldsher argues that Liberty's failure to perform a timely TSA violated her

25   right to appeal the TSA's conclusions.  She argues that her October 2012 appeal to Liberty

26   would have been different had the TSA already been conducted.  Even assuming that her

8

1   argument would have been different, Feldsher's argument is irrelevant because Feldsher

2   was ultimately able to challenge the results of the TSA by appealing to this Court in the

3   instant complaint.  *See Silver v. Executive Car Leasing Long-Term Disability Plan*, 466

4   F.3d 727, 731 n.2 (9th Cir. 2006) (holding that the plaintiff had "ample opportunity" during

5   trial to respond to paperwork generated by the defendant, even if he had been unable to

6   address it prior to the trial).  Her complaint repeatedly argues that the TSA should be

7   disregarded because it failed to consider the entirety of her medical record.  Because the

8   Court finds, as set forth below, that Liberty did not abuse its discretion in invoking the

9   mental illness clause, the Court need not determine whether Liberty abused its discretion

10   when, based on the opinions and recommendations of Dr. Rim, Dr. Young, Dr. Taylor, Dr.

11   Witham-Leitch, and an allegedly faulty TSA, it denied future benefits based on the any

12   occupation provisions.

13          Substantive Arguments

14          Third, Feldsher argues that Liberty failed to properly review the entirety of her

15   medical records, both in reaching its initial decision and in denying her appeal.  Ultimately,

16   however, the Court agrees with the argument advanced by Liberty: "It is correct that

17   opinions about the nature and extent of Feldsher's condition were somewhat varied, but it

18   was Liberty Life's job as claims administrator to resolve those differences of opinion" (#37

19   4:19-25).  Liberty's decision to rely on the medical opinions cited by the May 2012 letter

20   was not an abuse of discretion.

21          Feldsher notes that Dr. Le, Dr. Fuller, and the first neuropsychological examination

22   conducted by Dr. Young each suggested that her impairments were possibly, although not

23   definitively, caused by her seizures.  Feldsher argues that Liberty disregarded each of

24   these diagnoses, because they were not referenced in the May 2012 letter.

25          The May 2012 letter, by contrast, relied on Dr. Veerappan, Dr. Rim, the second

26   neuropsychological examination conducted by Dr. Young, and Dr. Taylor in support of its

9

1   position.  In the letter, Liberty asserts that Dr. Veerappan, speaking by phone to Dr. Rim,

2   said that Feldsher's seizures were under control, that she suffered from "cognitive

3   difficulties," which were "the main reason" she would be unable to work, and that he could

4   not identify the origin or cause of these impairments.  On January 26, 2012, after Dr. Rim

5   had spoken with Dr. Veerappan, he sent a document to Dr. Veerappan representing their

6   conversation.  Dr. Veerappan subsequently signed the document, verifying that it was an

7   accurate reflection of his views.  According to the document:

8       "[Dr. Veerappan] believed that [Feldsher's] seizures are under fairly good
        control, but she continued to have nonepileptic seizures. She also had
9       tremor involving the head and upper body which is not seizure activity.
        Apparently he saw this claimant the last time on 12/06/11. He believed that
10      the main reason that the claimant is not able to function on the job would be
        her cognitive difficulties.
11
        He does not know what seems to be causing her cognitive difficulties and he
12      does not feel that this was caused by her seizure medications. The doctor
        also acknowledges that the claimant has some psychiatric problems such as
13      anxiety and depression. He also acknowledges that the neurologic
        examinations have been normal."
14      (AR 000244-245)

15      The document contains nothing else that would suggest Liberty's reliance on this

16   passage was misplaced.  The assertions made in the May 2012 letter appear to be an

17   accurate distillation of Dr. Veerappan's conversation with Dr. Rim.

18      The letter additionally referenced Dr. Rim's peer review of Feldsher's file in support

19   of its position.  In the letter, Liberty asserts that Dr. Rim concluded that Feldsher would be

20   able to work if certain restrictions were accommodated, although it also noted that

21   prescribing precise limitations was "outside the scope of the expertise of this reviewer."

22   The primary conclusion Liberty relies on from Dr. Rim was that "purely from the

23   neurological perspective," Feldsher's nonepileptic seizures "should not cause any

24   impairment."  This is based on the following passage of Dr. Rim's analysis:

25      **3.  Please provide a description of the claimant's impairments . . . if any,
        and outline how any impairment translates to restrictions and
26      limitations . . . .**

10

. . .
As for genuine seizures, general seizure precautions such as not climbing ladders or working at unprotected heights and working around open machinery and driving a motor vehicle.  However, since it is difficult to differentiate from the genuine seizures and nonepileptic seizures, it cannot be stated the duration for the above mentioned restrictions.  However, the treating neurologist states that her genuine seizures are under good control at the present time.  The claimant also has nonepileptic psychogenic seizures which may or may not cause any impairments, but purely from the neurological perspective, this should not cause any impairment.
(AR 000253)

Again, nothing else from Dr. Rim's report suggests that the above passage was taken out of context or otherwise misconstrued.  The May 2012 letter is an accurate summary of Dr. Rim's analysis.

The source most heavily referenced by the May 2012 letter - and the analysis most heavily disputed by Feldsher - comes from Dr. Young's second independent neuropsychological evaluation.  In the letter, Liberty asserts its most fundamental conclusions - namely, that Feldsher's cognitive impairments were not the result of physical brain injury, and that Feldsher's cognitive impairments would not prevent employment - by referencing the following passages from Dr. Young's report:

**16.  Identify and describe and [sic] cognitive impairments that you think would significantly interfere with work related activities or responsibilities...**

Although many objective test findings were sub-average or worse, I cannot interpret these findings as being suggestive of stable physical brain injury–in turn resulting in always present cognitive symptoms.  Rather, manifest cognitive deficits likely have an episodic course.  Whether these episodes are seizure related or pseudo-seizure related is a matter of medical dispute.  Still, strictly speaking I have identified not [sic] stable cognitive deficits that would prevent employment.

...

**19.  At this point, do you think that identified cognitive impairments (related to physical conditions) and/or behavioral difficulties (related to physical conditions) would significantly interfere with this claimant's ability to fork [sic] on a full-time basis...?**

Again, no stable cognitive deficits are identified.  The question remains, are there episodic disturbances in mental focus/memory/thinking ability

11

associated with seizures, immediate post-seizures stat [sic] and/or pseudo-seizures?  I cannot offer a definitive answer to this question.  No test findings obtained by me attest to disability.

**20.  In summary, if cognitive deficits were demonstrated and evident based upon the test results, would you attribute them to psychological or physical conditions reported?**

No stable cognitive deficits were identified.
(AR 000237-238).

Feldsher disputes Liberty's interpretation of Dr. Young's assessment, dismissing Dr. Young's assertion that "[n]o test findings obtained by me attest to disability," and arguing that Dr. Young never addresses the severity of Feldsher's "episodic" seizures, or the impact of such on her ability to work.

Additionally, Feldsher cites Dr. Young's closing sentiment to argue that "Dr. Young's opinion on 'vocational disability' . . . was ill-defined at best and required additional follow through" (#32, 21:9-10).  In context, however, the Court finds that Dr. Young's report, including his concluding statement, supports Liberty's decision to deny Feldsher future benefits.  At the conclusion of his report, Dr. Young writes:

**Additional comments with regard to diagnostic impressions.**

As I understand it, the primary questions posed to me are: 1) Whether or not observed neuropsychological deficits are genuine . . . 2) If observed neuropsychological deficits, if determined to be present, likely have an organic cause.  3) Would such deficits likely result in vocational disability?

I have seen no strong evidence of frank malingering or symptom exaggeration.  Variability in scores . . . and some inconsistencies . . . do indicate to me that emotional variables are influencing test scores.

It cannot be asserted to the criterion of more likely than not that observed test scores reflect physical brain injury.

To the degree that vocational disability exists, it has to be based upon the episodic appearance of physical symptoms such as fatigue and disequilibrium and upon emotional consequences of her symptoms and associated loss of ability to focus on cognitive tasks and not direct physical injury to the brain undermining cognitive capacities.
(AR 000238)

It is true, as Feldsher argues, that Dr. Young's report leaves open the possibility that vocational disability exists.  However, Liberty interpreted Dr. Young's report to mean that to the extent vocational disability exists - and Dr. Young does appear skeptical of its existence - such disability was not due to physical injury.  The Court cannot say that this interpretation is unreasonable.

Finally, the May 2012 letter quotes Dr. Taylor's review of Feldsher's file, with particular emphasis on Dr. Young's report, in which Dr. Taylor stated, "I concur that findings from this standardized assessment did not support limitations in work capacity" (AR 000218, emphasis in original).  To the extent limitations in work capacity were "marginally supported" by the record, "it is my opinion that any limitations on work capacity are thought to be due to psychological factors."  *Id.*

In short, Liberty had before it the opinion of Dr. Veerappan, stating that the impairments preventing Feldsher from working were of unknown origin, but did not originate from her "genuine" seizures or her seizure medication; the opinion of Dr. Rim, stating that "from a purely neurological perspective," Feldsher's impairments, if any, "should not" originate from her pseudo-seizures; the opinion of Dr. Young, expressing skepticism that Feldsher had any impairments, but that to the extent she did, they were not due to physical brain injury; and the concurring opinion of Dr. Taylor, that Feldsher's work capacity did not appear to be limited, but that to the extent it might be, it was due to psychological factors.  On the other hand, Liberty also had before it the opinions of Dr. Le, Dr. Fuller and Dr. Young, produced nearly a year prior to the opinions of Dr. Veerappan, Dr. Rim, Dr. Taylor, and Dr. Young's revised opinion, suggesting that her impairments could potentially be traced to her seizures.  Weighing these opinions, Liberty determined that Feldsher's limitations "are of a mental-nervous origin."  Liberty additionally had before it opinions from Dr. Rim, Dr. Young and Dr. Taylor suggesting that, although certain restrictions may apply, Feldsher was not unable to work in any occupation.  This finding

1   would have also been sufficient grounds to deny future benefits, and references to these

2   findings were made in the May 2012 letter, including in its conclusory paragraph describing

3   the denial of future benefits.  Nevertheless, Liberty's primary grounds for denial remained

4   the mental illness provisions of the insurance plan.  Given this breadth of evidence, the

5   Court does not find that the decision of the May 2012 letter was based on a

6   misinterpretation of Feldsher's records, and therefore the Court cannot find that Liberty

7   abused its discretion in this respect.

8         After Feldsher appealed this decision, Liberty once again sought a peer review of

9   Feldsher's file to bolster its case.  Following the review, Liberty denied Feldsher's appeal

10  (AR 000094).  Once again, Feldsher argues that the determinations from Dr. Withiam-

11  Leitch's review were an abuse of Liberty's discretion because they failed to consider the

12  entirety of Feldsher's medical records.  The Court disagrees.  Dr. Withiam-Leitch's review

13  included a complete review of Feldsher's medical records, and additionally included a

14  conversation with Dr. Veerappan (AR 000104-109).  The Court cannot say that Liberty

15  abused its discretion when, based upon the entire record, and with an additional review

16  completed, it reaffirmed its decision to deny future benefits based on the mental illness

17  provisions.

18        Finally, Feldsher argues that even if Liberty did not misinterpret Feldsher's medical

19  documents, Liberty nevertheless abused its discretion because even under its

20  interpretation, the medical records never establish that Feldsher's impairments are due to

21  mental illness.  Feldsher argues that Liberty's own standards require confirmatory testing

22  before making a determination that an impairment is caused by mental illness.

23        This misrepresents Liberty's procedures.  The procedures cited by Feldsher detail

24  policies for when tests confirm mental illness and for when tests confirm physical

25  disabilities (AR 000839).  Feldsher cites no procedures that would require Liberty, in the

26  absense of such confimatory tests, to extend her disability benefits.  Rather, provisions in

1   Feldsher's policy demonstrate that she has the burden of proof for establishing the cause

2   of her disability.[2]   Moreover, the mental illness provision, in its entirety, also includes a

3   "Non-Verifiable Symptoms" limitation, in which a claim extension may be denied if

4   symptoms "cannot be diagnosed using tests, procedures or clinical examinations typically

5   accepted in the practice of medicine" (AR 000015).

6          Ultimately, the medical evidence before the parties must be interpreted.  Feldsher

7   argues the record never concludes that her impairments are due to mental illness.  Liberty

8   argues that, while never conclusive, the record "contains substantial evidence" to support

9   its conclusion.  Balancing these interpretations of the record, the Court finds that Feldsher

10  bears the burden of demonstrating that her impairments are not due to mental illness.

11  Liberty did not abuse its discretion when, in interpreting competing medical opinions and

12  nonconclusive medical evidence, it determined that Feldsher's impairments fell under the

13  mental illness clause of her insurance policy.

14  <u>Attorney's Fees</u>

15          Liberty's motion for judgment also seeks attorney's fees and costs.  Under ERISA §

16  502(g)(1), attorney's fees and costs may be granted at the discretion of the court.  29

17  U.S.C. § 1132(g)(1).

18          In determining attorney's fees in this context, the Ninth Circuit has instructed district

19  courts to consider five general factors:

20          (1) the degree of the opposing parties' culpability or bad faith; (2) the ability
        of the opposing parties to satisfy an award of fees; (3) whether an award of
21       fees against the opposing parties would deter others from acting in similar
        circumstances; (4) whether the parties requesting fees sought to benefit all
22       participants and beneficiaries of an ERISA plan or to resolve a significant
        legal question regarding ERISA; and (5) the relative merits of the parties'
23       positions.

24  _____

25          [2] See, for example, the following provisions: "Proof of claim must be given to
    Liberty;" "Proof of continued Disability . . . must be given to Liberty within 30 days of the
26  request for proof;" "The proof must cover . . . the cause of Disability . . . and the degree of
    Disability" (AR 000027).

1
2
*Carpenters S. Cal. Admin. Corp. v. Russell*, 726 F.2d 1410, 1415 (9 Cir. 1985) (citing *Hummell v. S. E. Rykoff & Co.*, 634 F.2d 446, 453 (9th Cir. 1980)).

3   Applying these factors in the instant case, the Court finds that Feldsher did not act in

4   bad faith and that several aspects of her case were meritorious.  Furthermore, the Court

5   believes granting attorney's fees in this action would wrongfully discourage individuals

6   situated similarly to Feldsher, in which the evidence may be closely contested, from

7   pursuing appropriate appeals.  Therefore, the Court will deny Liberty's request for the

8   payment of attorney's fees.

9       Motion to Seal

10   Feldsher and Liberty have filed a joint motion (#33) to seal Feldsher's motion for

11   judgment (#32).  Feldsher's motion for judgment included direct quotations of Liberty's

12   internal policies and procedures.  These quotations arose from documents previously

13   sealed by the Court (#19).  There being no opposition, and good cause shown, the Court

14   therefore will grant the motion to seal Feldsher's motion for judgment.

15   Therefore, for good cause shown,

16   THE COURT **ORDERS** that the Defendant's Motion for Judgment on the Pleadings

17   and Administrative Record (#31) is GRANTED;

18   THE COURT FURTHER **ORDERS** that the Plaintiff's Motion for Judgment on the

19   Pleadings and Administrative Record (#32) is DENIED.

20   THE COURT FURTHER **ORDERS** that the Joint Motion to Seal #32 Motion for

21   Judgment (#33) is GRANTED.

22
23   DATED this __18__ day of July, 2014.

24
25                                          Lloyd D. George
                                            United States District Judge
26